STEVENSON ARCHER, and others *vs.* STATE OF MARY-
LAND. STATE OF MARYLAND *vs.* STEVENSON
ARCHER, and others.

*State Treasurer—Liability of Official bond—Evidence—Re-
mand for New trial—Sec. 20 of Art. 5 of the Code—Con-
clusiveness of Judgment.*

Section 1 of Article 6 of the Constitution provides that the State
Treasurer shall be appointed by the two Houses, at each regular
session of the Legislature, and that the term of his office shall
be for two years, and until his successor shall qualify; and by the
same section he is required to take the oath and give the bond
prescribed by law.   By section 6 of Article 1 of the Constitution
and section 2 of Article 95 of the Code, he cannot enter upon the
duties of the office until he has taken the oath and given the
bond.   A. was elected Treasurer on the 28th of January, 1886,
and duly qualified.   On the 13th of January, 1888, he was again
elected, but did not take the oath of office or give another bond
until the 18th of November, 1889.   HELD:

That the first bond was responsible for all defalcations committed
by A. prior to the time when the second bond was given.

Of a lot of bonds purchased by the Treasurer, thirteen were miss-
ing when his defalcations were discovered.   The State showed
that nine were converted after the second bond was given.
HELD:

That the fact that nine of the missing bonds were converted after
the second bond was given, had no tendency to prove that the
other four were converted prior to that date, and was inadmissi-
ble as evidence for that purpose.

Section 20 of Article 5 of the Code, which enacts that "in all
cases where judgments shall be reversed or affirmed by the
Court of Appeals, and it shall appear to the Court that a new
trial ought to be had, such new trial shall be awarded," does
not authorize the Court to revise and correct the verdict of a jury
which the trial Court has permitted to stand, having refused to

Archer, *et al. vs.* State.

grant a new trial; and whether "a new trial ought to be had" in any given case must be determined by the rules and principles of law, and in accordance with the facts of the case under consideration.

The State sued on the bond of its Treasurer, given when he was first appointed, to recover for certain specified defalcations, and obtained a verdict in its favor, and a judgment entered thereon was affirmed by the Court of Appeals. The State afterwards moved that the case be remanded to the lower Court for a new trial to enable it to establish the liability of the sureties on the first bond for defalcations which occurred during the Treasurer's second term, the Court of Appeals having decided that his second bond was void, and that 'the sureties on his first bond were liable for all defalcations occurring during his second term. HELD:

That the motion should not prevail, as the judgment against the sureties on the first bond was conclusive as to all matters of liability which could have been litigated in that suit.

CROSS-APPEALS from the Circuit Court for Baltimore County.

The case is stated in the opinion of the Court.

*Plaintiff's Exception* stated in the opinion of the Court.
*Defendants' Exception.*—At the trial of this case the defendants offered the two following prayers:

1. It being admitted by the pleadings that Stevenson Archer was, on the twenty-eighth day of January, 1886, duly appointed by the two houses of the Legislature of Maryland, at its regular session; on joint ballot, for the term of two years, and until his successor should qualify, and that said Archer accepted said appointment, and duly qualified by taking and subscribing before the Governor the official oath prescribed by the Constitution, and by filing his bond, which was duly approved by the Governor, dated the second day of February, 1886, which is the bond sued on in this case, and that on the 13th day

of January, 1888, the said Stevenson Archer was reappointed by the two houses of the Legislature, at its regular session, on joint ballot, for a further term of two years, and until his successor should qualify, and that thereafter, without any further appointment or attempt to appoint, the said Stevenson Archer continued to exercise the powers and functions of the office of Treasurer, under his said appointment of 1886, without taking the oath of office prescribed by the Constitution, and without filing any official bond under his said appointment of 1888, until November 18th, 1889, on which day he took the oath of office prescribed by the Constitution, and filed a bond, which was approved by the Governor. Now the jury is instructed that the defendants are not liable in this action for any default of the said Archer, as Treasurer of said State, occurring subsequently to the 13th of February, 1888.

2. It appearing by the pleadings that at a regular session of the Legislature, the two houses thereof, on joint ballot, on the 28th day of January, 1886, appointed Stevenson Archer, Treasurer of the State of Maryland, for a full term, and that said Archer qualified by taking the oath of office and giving an official bond, which bond is the bond in the declaration mentioned; and further, that at another regular session of the Legislature, on the 13th day of January, 1888, the two houses thereof, on joint ballot, appointed said Archer to another full term as Treasurer of said State, and that subsequently to said second appointment no other appointment of a Treasurer of said State was made or attempted to be made until at a regular session of said Legislature, on the 9th day of January in the year 1890, the two houses thereof, on joint ballot, appointed said Archer Treasurer of said State for another full term; and further, that the regular session of the Legislature of 1888, was finally adjourned on the 2nd day of April in the year 1888; the

Archer, *et al. vs.* State.

jury is instructed that the defendants are not liable in this action for any default of the said Archer as Treasurer of said State occurring subsequently to the 2nd day of April in the year 1888.

The Court (FOWLER, C. J., and BURKE, A. J.,) refused to grant these prayers, and the defendants excepted. The jury rendered a verdict for $60,000 in favor of the plaintiff, and judgment was entered thereon. Both sides appealed.

The cause was argued before ALVEY, C. J., MILLER, IRVING, BRYAN, MCSHERRY, and BRISCOE, J.

*Edgar H. Gans, Albert Constable,* and *Bernard Carter,* for Archer, and others.

The bond in suit being a contract, the extent of the liability of the sureties is governed by the intention of the parties thereto, obligors and obligee, at the time of its execution. The question always is, what was within the mutual contemplation of the parties? When a bond is given for a term of office, if the duration of the term of office is not set forth in the recitals of the bond, and is fixed by law, the law fixing the term of office, is read with the bond as part of the contract. It has been settled by a long line of authorities that where the law fixes a definite term of office, then the bond given, though it contain very general words, is confined to that definite time. If, therefore, the language of the Constitution had been—" The term of office of the Treasurer shall be for two years," there can be no doubt but that the liability of the sureties would be confined to that definite time, and would not embrace any defalcation thereafter. And it is not understood that this proposition is seriously controverted by the State. *Mechem on Public Offices and Officers, sec.* 206; *Lord Arlington vs. Merricke,* 2 *Wm. Saund.,* 403, 413; *Leadley vs.*

*Evans,* 2 *Bing.,* 32; *Liverpool Water Works Co. vs. Atkinson,* 6 *East,* 507; *Pearsall vs. Summersett,* 4 *Taunt.,* 593, *Hassell vs. Long,* 2 *M. & S.,* 363; *Wardens, &c. vs. Bostock,* 2 *New Rep.,* 175; *Peppin vs. Cooper,* 2 *B. & Ald.,* 431; *Bamford vs. Iles,* 3 *Exch. Rep.,* 380; *Kitson vs. Julian,* 4 *El. & Bl.,* 854; *Union Bank of Maryland vs. Ridgely,* 1 *H. & G.,* 433.

It is contended by the State that though the liability of the sureties would be restricted to the two years, if the words of the Constitution were—"the term of the Treasurer shall be for two years;"—when the other words are considered, "and until his successor shall qualify"— the rule is different, for by force of these words the term of office is prolonged to the actual qualification of a successor. The bond according to this contention, was given by the sureties to cover the acts of Archer from the time of his appointment and qualification to the time of the actual qualification of his successor. The defendants contend that the presence of these words in the Constitution makes no difference in the rule restricting the liability already stated.

It is well settled in this State that where a definite term of office is fixed, the office does not become vacant upon the failure, for any cause, to elect or appoint a successor. The old incumbent holds over not merely as an official *de facto,* but as an officer *de jure* with full authority legally to exercise the functions and duties of the office. This rule is based upon the dictate of a sound public policy, and is not dependent upon the existence of any words such as "and until his successor shall qualify," but is uniformly applied in cases where the law regulating the term of office does not contain such words. This expression is therefore merely declaratory of the common understanding, and is always implied when not expressed. Archer would have held over *de jure* if the language of the Constitution had been—"The

term of the Treasurer shall be for two years "—precisely in the same way and to the same effect as he does with the superadded words, "and until his successor shall qualify." If these words are merely declaratory, if they are always implied, if the officer holding over holds *de jure*, whether the words are in the law or not, how can the expression of these words work a change in the rule of law restricting the liability of sureties already stated. *Thomas vs. Owens*, 4 *Md.*, 221; *Sappington's Adm'r vs. Scott*, 14 *Md.*, 53–6; *Marshall vs. Harwood*, 5 *Md.*, 432; *Smoot vs. Somerville*, 59 *Md.*, 88; *Robb vs. Carter*, 65 *Md.*, 333–336.

The language of the Constitution is express—"*and a Treasurer to be appointed by the two houses of the Legislature at each regular session thereof.*" The Legislature, at least the greater part of it, is elected every two years, and the manifest intention of the Constitution is that *every two years* a Treasurer shall be appointed by a Legislature fresh from the people. When this provision is read in connection with the other provision—"the term of office of the Treasurer shall be for two years and until his successor shall qualify"—it is evident that the Constitution contemplates a *biennial term*.

The term of office being definite, and distinguished from the time during which the incumbent may lawfully hold, Mr. Archer, after the 13th of February, 1888, or after the adjournment of the Legislature, whilst legally holding office, upon grounds of public policy, was holding *into the next biennial term*, the term of 1888–90. Therefore, if removed in January, 1889, his successor would hold for the unexpired balance of this biennial term of 1888–90, until the regular session of the Legislature in 1890. *State vs. Stonestreet*, 99 *Missouri*, 361.

"It is usually provided by law that officers elected or appointed for a fixed term, shall hold *not only for that term*, but until their successors are elected and qualified."

"Where this provision is found the office does not become vacant upon the *expiration of the term,* but the present incumbent will hold over until his successor is elected and qualified, even though it be beyond the term fixed by law." *Mechem on Public Offices and Officers, sec.* 397.

"The expression, 'term of office,' uniformly designates a fixed and definite period of time." *State vs. Stonestreet,* 99 *Mo.,* 372; *Speed & Worthington vs. Crawford,* 3 *Metcf., Ky.,* 213; *Parmater vs. State,* 102 *Ind.,* 95; *Mechem on Public Offices and Officers, sec.* 385; *Baker vs. Kirk,* 33 *Ind.,* 523; *Haight vs. Love,* 39 *N. J. Law,* 499–80.

In a case where the officer was to hold office for a definite time, and until his successor was elected and qualified, and there was a failure to elect and qualify, Mr. Justice BREWER thus describes the "holding over" period: "He may, it is true, be continued in office, as the statute has provided for preventing a vacancy between the close of one term and the election and qualification of a successor, *but he is simply filling part of his successor's term."* BREWER, J., now Justice of the Supreme Court of the U. S., in *Riddel vs. School District,* 15 *Kan.,* 170.

In a similar case it was held that the party holding over, held into *the next term,* and his successor, when appointed, held for the *balance of the unexpired term,* into which the old incumbent had held over. *Parcel vs. State,* 110 *Indiana,* 122.

The bond being a contract, the liability of the sureties is determined by the intention of the parties at the time of its execution. The question always is, what was within the mutual contemplation of the parties?

It is to be remembered that the Constitution provides for the appointment of a Treasurer at *every* regular session of the Legislature, that his qualification must follow within one month after the appointment, and that

on failure to qualify, the appointee is to be regarded as having refused the office, and a new appointment must be made by the Legislature. The State practically says to the bondsmen,—you sign this bond, and at the next Legislature you will be relieved by the appointment and qualification of a successor.

When the next session of the Legislature arrives, an appointment is made, but the appointee does not qualify within the one month thereafter, and it thereupon became the duty of the Legislature to make another appointment, which duty they failed to perform. The question therefore is, did the State on the one hand, and the bondsmen on the other, contemplate or take into consideration as part of their contract the violation by the Governor and the Legislature, of their constitutional obligations? The *Union Bank of Maryland vs. Ridgely,* 1 *H. & G.*, 324, was a case in which a cashier was appointed for a definite time, and held over by reason of an extension of the time being brought about by perfectly legal means. The Legislature had a right to extend the charter, and this right was well known to the parties, and in addition to that, looking to the nature of the corporation, it was extremely probable that such an extension would be sought and granted. And yet the Court held that the contract liability of the sureties could not be extended. *A fortiori* the contract of the sureties cannot be extended when the extension of the time of the officer's holding of the office is brought about by illegal means, by the violation of the Constitution of the State.

Again, the Court assign as a reason for limiting the liability of the sureties in that case, the impossibility of the corporation to appoint the officer for a time exceeding the legal existence of a corporation. So, in this case, it was likewise impossible for the Legislature to appoint Archer for a greater period than two years. An

appointment for three or four years would have been void.

The term two years does not mean two calendar years, but rather two legislative years, from one regular session of the Legislature to the other. "At every regular session of the Legislature, a Treasurer shall be appointed." Some reasonable time must be given, however, after the appointment, for a qualification. This reasonable period is fixed by the Constitution at one month. If the appointee neglects to qualify within this time, there is time given to appoint some one in his place. This time is also limited by the Constitution to the regular session of the Legislature. In case the Legislature makes no attempt to appoint, however, the "*holding over period*" dates from the expiration of the one month allowed for qualification. This reasonable time for qualification is the only additional time, beyond the term of office, for which the sureties may be held, the Legislature having made no further effort to appoint; and this is the time, according to the great current of authority which is designated by the expression, "and until his successor shall qualify." *Mayor, &c., of Rahway vs. Crowell*, 11 *Vroom*, 211; *Chelmsford Company vs. Demarest*, 7 *Gray*, 1; *City Council of Montgomery vs. Hughes*, 65 *Ala.*, 20; *County of Wappello vs. Bigham*, 10 *Iowa*, 39; *Kingston Mutual Ins. Co. vs. Clark*, 33 *Barb.*, 196; *Harris vs. Rabbit*, 4 *Dillon*, 185; *Dover vs. Twombly*, 42 *N. H.*, 59; *Welch vs. Seymour*, 28 *Conn.*, 387; *State vs. Mann*, 34 *Vt.*, 377-9; *Mayor, &c., of Wilmington vs. Horn*, 2 *Harrington*, 190; *Riddel vs. School District*, 15 *Kan.*, 168; *Mutual Loan and Build. Asso. vs. Price*, 16 *Fla.*, 204; *County of Scott vs. Ring*, 29 *Minn.*, 398-405; *State vs. Powell*, 40 *La.*, *Ann.*, 241; *Bigelow vs. Bridge*, 8 *Mass.*, 275; *Citizens' Loan Asso. vs. Nugent*, 11 *Vroom*, 215; *Mechem on Pub. Offices and Officers*, sec. 286; *Murfree on Official Bonds*, secs. 620-625.

And in the States in which these decisions occur limiting the liability of the bonds, the officers were held to

Archer, *et al.* *vs.* State.

hold over *de jure.*    *Stilsing vs. Davis,* 45 *N. J. L.,* 390 ; *Hubbard vs. Crawford,* 19 *Kan.,* 570 ; *Chandler vs. Bradish,* 23 *Vt.,* 416 ; *McCall vs. Byram,* 6 *Conn.,* 428 ; *Overseers of the Poor of Boston vs. Sears,* 22 *Pick.,* 122 ;

It was argued in the Court below that the defendants could take no advantage of the negligence of the Governor and Legislature in failing to appoint a successor to Archer upon his neglect to qualify, upon the ground that sureties on official bonds are not discharged by the laches of government officials.    The defendants do not deny the principle.    It is well settled.    But they deny its application to this case.    The defendants do not contend that they *are discharged* from any liabilities, which they have assumed, but that they have not *assumed* the liabilities at all for this holding over period.    These liabilities can only exist by reason of the extension of the time of holding the office on account of the negligence of the public authorities, and this negligence, the defendants claim, cannot *create* the liability ; and so the cases decide.

*John Prentiss Poe,* and *Wm. Pinkney White, Attorney-General,* for the State.

The constitutional term of the State Treasurer is for two years, "and until his successor shall qualify." Before entering upon the duties of his office he is required to take and subscribe the prescribed oath of office before the Governor, and to file a bond in the penalty of $200,000, with sureties approved by the Governor.

The qualification, therefore, consists in taking and subscribing such oath, and in filing such bond.

Mr. Archer did thus qualify for the first term on February 2nd, 1886, and consequently, by the express language of the Constitution, was entitled to hold the office upon which he then entered under such qualification, *until the election and qualification of his successor.*

The sureties on his official bond must be conclusively presumed to have known and understood this constitutional provision, and to have intended to become bound for the faithful discharge of his official duties for the whole duration of his official term, no matter what such duration might be. Indeed the bond is to be expounded as if it contained the provisions of the Constitution, set out in terms as the express and clearly defined contract of the parties.

They must be conclusively held to have known that while ordinarily his successor might be expected to qualify within one month after his election, and so put an end to the term of their principal, and at the same moment to their liability under their bond for him, it was quite possible that his successor might not qualify within such time, and that consequently their principal might hold over for a further period, and that their liability as his sureties might thus be continued for such further period, according to the plain meaning of their contract, distinctly and palpably within its terms, and within what must be imputed to them as their understanding when they signed and delivered it.

The provision in the Constitution that the term of the Treasurer should last for two years "and until his successor shall qualify," was inserted to prevent the possibility of a vacancy and *interregnum*. It presupposed the possibility that the constitutional machinery might not always run with perfect exactness and regularity—that newly-elected officers might fail to qualify—that incumbents might decline to vacate—that contingencies might happen whereby an official who ought to retire in favor of his successor might contest the right of his successor to the office, and might in consequence of such dispute hold on to his office until such contest could be settled—and that an official elected as his own successor might neglect to put an end to his existing term by

qualifying under his second appointment and entering upon a new term. All these probabilities were in the minds of the framers of the Constitution when the clause in question was inserted, for it was a well-known part of the judicial history of the State, that controversies involving the rights of officials under similar circumstances had taken place.

The protracted contest over the State Library, between *Marshall and Harwood,* which engaged the attention of this Court four times (5 *Md.,* 423 ; 7 *Md.,* 466 ; 9 *Md.,* 83 ; 10 *Md.,* 451), and the struggle of Mr. A. Lingan Jarrett to obtain possession of the office of Comptroller (17 *Md.,* 309), were well remembered—and it was to avoid as far as possible the recurrence of such difficulties, that careful provision was made that in addition to the specific time for which the officer was to hold his office, there should be a superadded time, *as much a part of his constitutional term as the specific time,* covered by the significant words "and until his successor shall qualify," during which he should also hold his office.

There was to be no distinction as to the powers, duties, functions and responsibilities of the Treasurer during any part of this entire period—there was to be no vacancy if the newly-elected incumbent failed to qualify, for the old official was to hold until his successor should qualify. And he was to hold, not as a mere officer *de facto*—not as a temporary *locum tenens*—not as an intruder—not as an incumbent in upon sufferance—but as a constitutional officer, lawfully exercising all his constitutional powers, and charged with the performance of all his constitutional duties.

His sureties contracted with reference to this clear provision of the Constitution—distinctly declared as a well-established principle in the constitutional history of our State, in the well-considered case of *Thomas vs. Owens,* 4 *Md.,* 221, and reaffirmed with emphasis in the

then recently decided case of *Smoot vs. Somerville*, 59 *Md.*, 86. There is no one of the sureties who did not in point of fact know and understand this to be a cardinal principle of our organic law, and if it can be supposed that any one of them was ignorant of the express letter and clear meaning of the Constitution in this particular, such ignorance of this fundamental doctrine cannot be permitted to be pleaded.

Starting, therefore, with the concession that the sureties knew that the constitutional term of Mr. Archer as Treasurer was for two years, *and for such further period as might elapse until his successor should qualify*, and that when they became his sureties they intended to become bound for the faithful performance of his constitutional duties during his constitutional term, no matter how long that might continue, it requires some boldness, or some peculiar ingenuity of intellect to formulate the proposition that while after the 13th of February, 1888, and down to the time of his qualification under his second appointment, he was a *de jure* Treasurer, he was such *de jure* officer during that period without bond for the faithful discharge of his duties as such. *He could not be a de jure officer without a bond.* The giving of an approved bond was a condition precedent to his entering upon the duties of his office, and when he once gave bond and took upon himself the powers and responsibilities of his office, the bond lived on with him as an indispensable condition—an inseparable concomitant of his official life. It started with him when he began. He could not begin without it. It continued on as long as he held on to the office. He could not lawfully hold on without it, and it came to an end when his term came to an end and not until then.

When we fix the duration of his constitutional term, we fix at the same time and by the same decision, the duration of the liability of his bond.

And the contention that *his bond* came to a sudden end on the 13th of February, 1888, while he himself lawfully continued thereafter to be Treasurer under the appointment and for the term which the bond when given was designed to apply to and cover, is necessarily and intrinsically illogical and irrational—contrary to the express language of the Constitution and directly repugnant to what the sureties must be presumed to have intended when they entered into their obligation.

They may indeed have supposed that within one month after the election of his successor, such successor, whether Mr. Archer himself, or some other person, would probably qualify, and that his constitutional term would thereupon come to an immediate end.

But the provision in the Constitution (Article 6, section 5), which directs that "the Treasurer shall qualify within one month after his appointment by the Legislature," is an injunction applicable to and operative upon the newly-elected Treasurer, and not a limitation upon the duration of the term of the existing incumbent. The latter is to continue to hold until the former shall qualify, and hence whether the provision above quoted be regarded as directory or as mandatory, is wholly immaterial in this discussion.

This is made perfectly plain by supposing that the Legislature, instead of re-electing Mr. Archer on January 13th, 1888, had elected some other person, and that other person had omitted to qualify until November 18th, 1889.

Mr. Archer would have lawfully held over until such qualification of his successor ; and thus holding over as a constitutional officer for a legal term which ran on until put an end to by such qualification, his sureties would have continued to be liable for his official acts during such holding over, as well as during the period before the election of his successor. The obligation of the sureties, in other words, would be and is co-extensive

with the official life of their principal, beginning when he stepped into office and ending only when he stepped down and out.

The fact that he was elected as his own successor cannot change the aspect of this plain proposition, though some confusion of thought is likely to be occasioned by the failure to deal with the question at issue, as if instead of having been re-elected, some other individual had been appointed as his successor—and the liability of the sureties is to be considered as if a new incumbent had been appointed.

This liability, then, is to be determined by giving to the words of their bond their plain and natural meaning —and the provisions of the Constitution enter into and form a part of it, as fully to all intents and purposes as if they had been embodied in it at length.

Indeed, we are to read it as if it ran as follows :

"Whereas the above bounden Stevenson Archer has been duly appointed Treasurer of Maryland in pursuance of the Constitution, for the full period of two years and for such further period thereafter as shall elapse until his successor shall be duly elected and shall qualify,

"Now the condition of the aforegoing obligation is such, that if during said specific period of two years and during such further period thereafter as shall elapse until his successor shall qualify, the said Stevenson Archer shall well and truly execute, discharge and perform the duties of the said office of Treasurer in all things appertaining thereto, then this obligation shall be void ; otherwise to be in full force and virtue in law."

Thus stating the contract—thus expressing in words what is necessarily implied, as fully as if expressed, all difficulty disappears.

The bond is liable from the time it was approved, on February 2nd, 1886, down to the time when Mr. Archer, as his own successor, terminated his first term, by

Archer, *et al.* *vs.* State.

qualifying under his second appointment. Any other construction would dislocate his term, and divide it into two segments, the one being for the period during which he lawfully held *de jure* as a bonded officer—the other being for the residue of the period during which he also lawfully held *de jure* as an officer without bond. Such a division of his term cannot be the true view of the Constitution.

The pleadings and proof show that on November 18, 1889, he appeared before the Governor, took and subscribed the prescribed oath of office, and tendered a new bond in the penalty of $200,000, with sureties—which bond was duly approved by the Governor, and deposited with the clerk of the Court of Appeals to be recorded.

The fact, therefore, being that he actually qualified on that day under his second appointment; that he intended this to be a valid and effectual qualification; that it was designed and accepted also by the Governor as a legal and sufficient qualification, the plaintiff, in its replications, following in the line of the statement in the first plea of defendants as to such actual and intentional qualification on that day, adopted that day as the time when the liability of the first bond terminated.

Looking to well settled Maryland adjudications construing our own Constitution and defining our State policy, the opinion of the Court below upon the defendants' demurrer and prayers, is impregnable.

While we have no disposition to deny that authorities can be found sustaining a different view from that which we must regard as established Maryland law, we can well claim that authorities quite as weighty and cogent as any that can be cited against us, strongly, clearly and distinctly affirm what we may well call the Maryland doctrine. *Tuley vs. State,* 1 *Ind.,* 502 ; *Akers vs. State,* 8 *Ind.,* 484 ; *Butler vs. State,* 20 *Ind.,* 173 ; *State vs. Berg, et al.,* 50 *Ind.,* 496; *State vs. Kurtzeborn,* 78 *Mo.,* 99;

*City of Fond du Lac vs. Moore,* 58 *Wis.,* 170 ; *Supervisors of Omro vs. Kaime,* 39 *Wis.,* 468; *Dunphy vs. Whipple,* 25 *Mich.,* 10, *Placer Co. vs. Dickerson,* 45 *Cal.,* 12; *Chairman of Common Schools vs. Daniel,* 6 *Jones,* (*Law*), 444; *Sparks vs. Farmers' Bank,* 9 *Am. Law. Reg.,* (*N. S.*) 365; *Thompson vs. State,* 37 *Miss.,* 527; *South Carolina Society vs. Johnson,* 1 *McCord,* 44 ; *Murfree on Official Bonds, sec.* 225.

BRYAN, J., delivered the opinion of the Court.

Stevenson Archer was elected Treasurer of Maryland on the twenty-eighth day of January, 1886, and was duly qualified by taking the oath of office, and giving the required bond. He was elected again on the thirteenth day of January, 1888 ; but did not again take the oath of office, or give another bond until November the eighteenth, 1889. Between the time of his qualification in 1886, and the eighteenth of November, 1889, he embezzled sundry bonds and sums of money belonging to the State, which were in his possession as Treasurer. The State brought suit on the bond given in 1886, and sought to recover for the full amount of embezzlements which were committed between the time when this bond was given and approved, and the eighteenth day of November, 1889, when the second bond was given, and the second oath of office was taken. The question was presented in a variety of modes in the pleadings, and by prayers for the instruction of the jury. It is sufficient for us to determine the extent of the liability of the bond, without adverting to the form in which the question arises.

The first section of the sixth Article of the Constitution provides that the Treasurer shall be appointed by the two Houses, at each regular session of the Legislature, and that the term of his office shall be for two years and until his successor shall qualify. By the

same section he is required to take the oath and give the bond prescribed by law ; and by the sixth section of the first Article of the Constitution and the second section of the ninety-fifth Article of the Public General Laws, he could not enter upon the duties of the office until he had taken the oath and given the bond. They were preliminary steps indispensably necessary to his possession of the office. The bond, now to be considered, pursues the directions of the statute. It is on the condition that Archer shall well and faithfully discharge, execute and perform all and singular the duties required of him by the Constitution and laws, as Treasurer of the State of Maryland, in all things appertaining to his office. It must be assumed that he was thus bound for the discharge of his duties for the full term on which he was about to enter, but no longer. On this point there is a general agreement among the authorities. The question certainly must be considered as settled in this State by the decision in *State vs. Wayman,* 2 *Gill & J.,* 254. The length of the term of office seems to be accurately defined by the words of the Constitution. They are neither obscure nor ambiguous ; they declare that the Treasurer's term is for two years, and until his successor shall qualify. It must be for two years at the least, and is still further to continue until the occurrence of a distinct, definite and unequivocal event. The term begins when the Treasurer qualifies, and it expires when his successor qualifies. The beginning is fixed and the end is fixed ; the demarcation of its limits seems to be sufficiently clear. It is not difficult to see the purpose of the framers of the Constitution. It was considered necessary that there should always be a public officer in existence competent to take charge of the treasury, and that his fidelity should at all times be secured, as far as possible, by a stringent oath, and by a bond embracing every detail of his duties. Without these guaran-

ties no Treasurer was permitted to enter upon the duties of his office.   And there was to be no interval when his oath and bond were not pledged for his official integrity. The statute law added still further to the security of the public funds by providing that the Treasurer should not remain in office if his bond should become invalid or insufficient.   By the sixth section of Article ninety-five of the Public General Laws it is made the duty of the Governor in  such an event to require him to give a new bond with approved security ; and in case of his failure to do so, he is to be removed from office by the Governor and a successor is to be forthwith appointed in his place. No one can fail to see the extreme and sedulous care with which the Constitution and laws have endeavored to guard the public money.   It cannot be rationally con-jectured that it was their purpose to leave the treasury for any single moment without the protection of an oath and a bond.   The plain and obvious meaning of their words shows the contrary intention.   And it is manifest that if the bond did not cover the whole of the Treas-urer's term, the protection would be entirely inadequate. If there were one month, or one week, or one day in which a Treasurer might embezzle with impunity, great damage might ensue without possibility of redress.   The bond covers the whole term ; the term extends until the qualification of the successor ; and we are unable to discover any mode of ratiocination which would withdraw any portion of this term from the operation of the bond. Unquestionably the Treasurer is bound to be faithful in the performance of his duties at all times without inter-mission while he is in office.   There is no moment when the obligation of duty does not rest upon him.   For a long succession of years previously to the adoption of the present Constitution, there had been controversies about the duration of terms of office; and the responsibility im-posed by official bonds frequently depended on the deter-

mination of these questions. In *Wayman's Case,* 2 *Gill &
Johnson,* a Register in chancery continued in possession
of the office for five years without receiving a renewal of
his original appointment. It was held that the tenure
of his office under the then existing Constitution was
limited to one year ; and that after the expiration of
that time, he was not legally an incumbent of the office,
and that his official bond was not any longer responsible
for his acts and omissions. . The inconveniences of such
a tenure of office are manifest. They are now happily in
a great measure removed. To speak only of the office of
Treasurer, we can see a progressive change in the pro-
visions of the successive Constitutions relative to it. In
the Constitution of 1851, it was merely directed that he
should be "appointed by the two Houses of the Legisla-
ture at each session thereof." This would make his term
about two years. The Constitution of 1864, after stating
that he should be elected at each regular session of the
Legislature, in express words declared that he should
hold his office for two years. Nothing was said in either
of these Constitutions about an extension of the term of
office. But. in our present Constitution, an important
addition was made to the words which described the term
of office. Thenceforth it was to endure until the quali-
fication of a successor. We cannot shut our eyes to the
importance of this change, nor to the public interest .
involved in it. We have been referred by the learned
counsel who argued this cause with such remarkable
ingenuity and ability, to many decisions, where words
similar to those in our Constitution have been construed
by learned Courts. In some of them a construction has
been given agreeing with the one which we have stated ;
and in others an opposite result has been reached. We
give full recognition to the weight of these authorities ;
and we have no disposition to criticize them, or to evade
their application under appropriate circumstances. But

our own law on this question is in a measure historical. The constitutional provision was the result of public necessity, and was prompted by the recollection of many a weary controversy in which justice had been defeated. It was an effort to remedy some of the evils which experience had disclosed. Having this knowledge, it is our duty to give full effect to the intention of the framers, in the spirit in which it was conceived. This suit is brought to recover the amount of all defalcations committed previously to the eighteenth of November, 1889. In our opinion the bond is responsible for them ; but we do not at present consider whether the liability extends to a later date. . The effect of taking the oath and giving the bond on that day, we are not now called upon to determine. This question is presented in another case which has been argued before us, and it will be decided at the proper time.

In this case both parties have appealed to this Court. In what we have said we have disposed of the defendants' appeal, and have sustained the ruling of the Court below. The State took a bill of exception which presents a question of evidence. It had been shown that Archer had purchased for the State one hundred and forty Baltimore and Ohio Railroad Company Car Trust bonds of the denomination of a thousand dollars each, and that between January, 1889, and October the thirtieth, 1889, he had fraudulently appropriated to his own use twenty-four of these bonds. Twelve of them had been redeemed and the proceeds duly accounted for by Archer ; ninety-one of them had been found by a committee who examined the boxes which were rented by the State from the Safe Deposit and Trust Company. There were still lacking thirteen to make up the original number of a hundred and forty. The State offered to prove that subsequently to the eighteenth of November, 1889, Archer converted nine of these bonds to his

Archer, *et al. vs.* State.

own use, and its counsel stated that these were all which it could trace as converted after that date. This evidence was tendered for the purpose of proving that the other four of the missing bonds were misappropriated by Archer prior to said eighteenth of November. The Court refused to permit the evidence to be given. The fact that Archer converted nine bonds after the eighteenth of November had no tendency to prove that he had converted four others prior to that date. There is no circumstantial connection between these two facts. It cannot be said that they are associated together as antecedent and consequent in the usual and common course of events. One of them is not the ordinary concomitant of the other. The circumstance that the State could not prove that more than nine bonds were taken after the date mentioned simply leaves the disappearance of the others unexplained; the date of their conversion unproved. The State had shown that twenty-four of these bonds had been taken before this date; but it has not been argued that this is a circumstance capable of proving that the others were taken after the date. Yet it must be seen that if taking nine bonds after this day would show that the four others were taken previously; the taking of twenty-four bonds before the day would show equally as well that the others were taken subsequently to the day. But neither proposition can be maintained. The point of time when the defalcation occurred is an essential fact in this controversy, and it must be proved as other facts are proved in Courts of law. Suppose that it had been proposed to prove on the part of the State that it had not evidence to show any defalcation after the eighteenth of November, would this have been considered evidence that they had all been committed before that time? It would probably have been universally regarded simply as a failure of proof in an essential particular. The offer of the State now in ques-

tion must be placed in the same category ; it is an offer to prove that it was unable to show any defalcation after the date mentioned, except as to 'nine bonds; in other words an offer to show a defect of proof. The same defect of proof applies to the predicament of the four bonds as well before this date as afterwards. And the offer resolves itself into a statement that there is no evidence of the time when they were misappropriated. Archer was brought into Court as a witness for the State ; but he refused to be sworn. In the course of the trial, it was very apparent that he could have given important testimony for the State, if he had chosen to do so. But, nevertheless, the facts within his knowledge were required to be proven by competent evidence, so far as they were admitted into the case. Whatever other consequences resulted from his silence, it did not authorize the admission of testimony which was wanting in the probative force which the law exacts.

We must affirm the rulings of the Court on both appeals.

*Judgment affirmed.*

(Decided 17th June, 1891.)

BRYAN, J., delivered the opinion of the Court, as follows, on the motion made on behalf of the State to remand the foregoing cause for a new trial:

After the opinion in affirmance of this judgment had been delivered, a motion was made in behalf of the State to remand the cause for a new trial. The motion was founded on the twentieth section of the fifth Article of the Code of Public General Laws. This section enacts that "in all cases where judgments shall be reversed or affirmed by the Court of Appeals, and it shall appear to the Court that a new trial ought to be had, such new trial shall be awarded." Whether "a new trial ought to

Archer, *et al. vs.* State.

be had" in any given case must be determined by the rules and principles of law. The Court must obtain from legal sources the materials on which its judgment is to be founded; that is, from sources of information which the law authorizes and empowers it to seek and examine; the conclusion is then deduced by the law according to established maxims. The law is a system of reason which administers justice according to rules which long experience has shown to be best adapted to secure this end in the vast majority of cases. When a result is reached by the application of these rules, it is the duty of Judges to pronounce the decision without reference to their private sentiments, or private information. Justice would indeed be precarious if from such cause, or from any other cause, its administration were not conducted according to fixed, steady, established and prescribed canons of decision.

This suit was brought on the official bond given by Archer in February, 1886, and the breach alleged was, that between the time when this bond was given and the eighteenth day of November, 1889, he fraudulently appropriated to his own use large numbers of the bonds and securities belonging to the State, and in his possession as Treasurer. The Circuit Court ruled that the bond was liable for all defalcations committed between these dates, and left it as a question to the jury to find their amount on the evidence in the cause. The jury rendered a verdict for sixty thousand dollars. A motion for a new trial was made by the State, but the motion was overruled by a divided Court, and the verdict sustained. An appeal was taken by the defendants to this Court, and we have approved the rulings of the Court below, which held that the defalcations up to November the eighteenth, 1889, were covered by the bond; and we have affirmed the judgment. There was an exception in behalf of the State to the refusal of the Court to

Archer, *et al. vs.* State.

admit certain testimony, and an appeal on that ground. This matter will be noticed hereafter; but it does not affect the question which we are now considering. If the verdict was erroneous, it is not within the capacity of this Court to correct the error. We have no power to revise the verdicts of juries. The law confides this jurisdiction exclusively to the trial Courts. They have the right to set aside a verdict if they believe it to be contrary to law, or unwarranted by the evidence. But if they permit it to stand, we are obliged to recognize it as correct. We have absolutely no alternative in the matter. Our functions are confined to a review of the questions of law decided by the Court below. This case is then like many others which are constantly occurring; a judgment has been rendered against defendants, and on their appeal it has been affirmed. The plaintiff having deliberately sued on the bond for certain specified defalcations, and having successfully maintained its legal positions with respect to the liability of the bond to the extent alleged; and having taken the verdict of the jury on the evidence offered to prove the matters of fact in controversy; and the judgment of the trial Court in his favor having been affirmed by the Court of last resort, it now moves for a new trial for the purpose of comprehending in this suit additional averments with respect to facts which were as well known to it when the suit was brought as they are at present. We must pause and consider carefully the grounds of this motion, before we give our assent to it. We may well inquire into the rights of the defendants in this behalf; and we may well ask whether the just limit of litigation has not been reached. *Expedit reipublicae ut sit finis litium.* It has been said that "Justice requires that every cause be once fairly and impartially tried; but that having been once so tried, all litigation of that question, and between those parties, should be closed forever." No

Archer, *et al. vs.* State.

declaration of principle could be more just, and none has received more universal approval. The plaintiff ought to have included in the suit on the bond all matters of liability which could have been litigated in that suit. The law does not allow two suits, when the whole subject of controversy might have been settled in one. In *State vs. Brown and Brown, Trustees, &c.,* 64 *Md.,* 204, we said, quoting from the Supreme Court of the United States, in reference to the conclusive effect of a judgment in a former suit: "It extends not only to the questions of fact and of law, which were decided in the former suit, but also to the grounds of recovery, or defence, which might have been, but were not presented." The plaintiff's counsel proceeded on the theory that defalcations after the eighteenth day of November, 1889, were not recoverable in this suit; and they brought suit for them on Archer's second bond. This Court Held that the second bond was void, and that the bond on which the present suit was brought was responsible for Archer's malfeasance until his third appointment and qualification in January, 1890. The theories of the opposing counsel in this cause were in conflict on almost every question involved in the case; there was contestation and strife at every step of its progress. The result of the litigation has been a disappointment to both sides. We have not sustained the views of the plaintiff's counsel in respect to the liability of the second bond. But we cannot regard this as a reason for awarding a new trial in a case, which has been regularly conducted to a final judgment in this Court. Counsel elect the grounds on which they will rest their case, present it in the mode approved by their own judgment, and adduce such testimony within their reach as they see fit to submit to the jury. They are frequently disappointed in the result of the suit. But we do not see that the consequences should be visited on defendants without some default on

their part. It is a serious penalty to impose on them the burden, expense, and vexation of continued litigation. It has been said in the brief of the plaintiff's counsel that the verdict for sixty thousand dollars in this case is "utterly *irrational and indefensible*," and that the refusal of the Court below to grant a new trial is a good and sufficient reason for this Court to exercise its "*undoubted power*," and to perform its "*high duty*" of awarding a new trial. And we are solemnly adjured *to act upon what we "judicially know to be the truth, and to give effect to the plain text of our rule."* And the following extraordinary statement is made: "We lay before you the records of your own Court, and the judgments which you have rendered upon them, and from them we say that the truth stares you in the face, and makes it appear as clear as light, that such a practical perversion of justice as a judgment for $60,000 for Archer's confessed embezzlement of $125,000, from 2nd February, 1886, down to 30th January, 1890, should not stand as a sample of Maryland justice in such a melancholy and memorable incident in our State history; but that a new trial ought to be had to rescue the administration of our law from such a lasting stigma." We can make due allowance for the earnestness of counsel in behalf of their clients, and for the depth of their convictions produced by the warmth of their zeal. It is our part to decide questions before us without any of the excitement, which naturally belongs to the efficient discharge of the duties of the advocate. The verdict in the case comes before us with all the sanctions which the law can give to any verdict. It was duly rendered in a legal and constitutional manner, and was approved in a legal and constitutional manner. If the Circuit Court had given the jury erroneous instructions on matters of law, the judgment would have been reversed; but we have no power, whatever, over a verdict regularly rendered upon

correct legal instructions. No matter what private opinions we might form as individuals on the merits of the case, we are constrained by our official duty to pronounce the judgment on this verdict which the law has pronounced upon it. We trust that this Court will never be found under the exigencies of any case, supposed or real, attempting to exercise forbidden jurisdiction. The plaintiff's brief speaks of Archer's confessed embezzlement of a hundred and twenty-five thousand dollars. We do not see in the record of any of the cases which have been before us any confession of any kind relating to the amount of embezzlement; on the contrary there was vigorous conflict and controversy on this question, as on every other one involved in the cause. The evidence on the subject was fairly submitted to the jury, but they refused to find according to the arguments of the plaintiff's counsel, and their verdict was sustained by the Court. If we look at the record of the suit on Archer's second bond, we find that judgment was rendered for defalcations committed between the eighteenth day of November, 1889, and the thirtieth day of January, 1890, at which time Archer was qualified under his third appointment as Treasurer of the State of Maryland, and that the amount of the judgment was $12,857.55. This Court held that the second bond was invalid, and that the first bond was a security for all defalcations up to the thirtieth of January, 1890. We thus see that two suits have been brought and prosecuted to a final judgment in the Court of last resort for the purpose of enforcing a liability which was enforceable in the first suit. The object of the motion in this case is to enable the plaintiff by amending its pleadings to try the whole question of defalcation up to January 30th, 1890; that is, to try again the same questions, which have already been tried in the two suits which have been determined by final judgments in this Court. The

result would be, in effect, three suits for the decision of a controversy, which was properly and legitimately determinable in one suit. The suit on the first bond was tried without the least error in law; everything demanded in that suit has duly and legally passed into judgment. The question of liability up to November the eighteenth, 1889, has been adjudged with as much formality and solemnity as the law is capable of expressing on any subject. And we are asked to order a retrial of these issues, not for any error in trying them, but for the purpose of enabling the plaintiff to combine with them other issues, which ought to have been united with them in the first instance. There is a maxim of the law, venerable for its antiquity and much esteemed for its wisdom: *Nemo debet bis vexari pro eadem causa.* We shall refuse to be the first Court to question its authority. The defendants are entitled to its benefit in this case. Further litigation under the first bond would be unwarrantable.

The appeal in behalf of the State did not bring into review any question respecting the liability of the bond; as all its propositions of law in this respect were sustained by the Court below. The State offered to prove that Archer had converted certain bonds to his own use after November the eighteenth, 1889; and this offer was for the purpose of founding an argument that certain other bonds of the same group had been converted by him previously to that date. The Court refused to admit the testimony and we approved its ruling. It was not intended that the proffered testimony should be a ground of recovery ; for it was distinctly understood that recovery was sought only for occurrences before the said eighteenth day of November. It is manifest that the State's appeal from this ruling has no connexion with the merits of this motion.

Counsel have referred to several cases which have arisen under the legislation on this subject, all of

which with some slight alteration is embodied in the Code. In *Kennerly's Ex'x vs. Wilson*, 2 *Md.*, 245, the action was trespass *quare clausum fregit*, brought by an executrix to recover damages for injuries to the real estate of the testator committed in his life-time. The declaration alleged damages to the testator in his life-time, but did not allege damage to the executrix. Because of this omission, the Court below sustained a demurrer to the declaration and rendered judgment for the defendant. This Court affirmed the judgment. On motion, however, it ordered a *procedendo*. The declaration set out a good cause of action, which could not be submitted to a jury because of a technical error in the mode of laying the damages. The error in no way affected the merits of the case, and was one which the law allows to be corrected by amendment. The motion for a *procedendo* was under the Act of 1826, chapter 200. The Court said : "In our opinion, the manifest design and meaning of that Act was to extend the powers of the Court to every case which had merits disclosed by the record, but which could not be elicited as the case was then presented." *Earnshaw vs. Sun Mutual Aid Society*, 68 *Md.*, 477, was decided on the authority of this case, and is grounded on the same reason. A suit was brought on a certificate of membership in an incorporated mutual aid society. But the declaration was not properly framed, and the certificate though a good cause of action could not be admitted in evidence to the jury under the defective pleadings. This Court sustained the ruling of the trial Court in taking the case from the jury ; but held that if the judgment was affirmed, a new trial ought to be ordered notwithstanding the affirmance ; and that, as in this view, it was immaterial to the parties whether the judgment was affirmed or reversed, the latter course would be adopted. It will be perceived in both of these cases that the plaintiff had stated a good

cause of action in the declaration; but that in conse-
quence of merely technical impediments, it could not be
laid before the jury for their consideration. *Parker vs.
Sedwick,* 4 *Gill,* 318; and *Beall's Lessee vs. Beal and
Hendrixon,* 7 *Gill,* 233, were brought to the Court of
Appeals by bills of exceptions on the part of the plain-
tiffs in the Court below. *Procedendo* after affirmance
was ordered in both of these cases under the Act of 1830,
chapter 186. The purpose of this Act was, as stated in
its title, to prevent unnecessary accumulation of costs in
civil suits. The first section enacts as follows : "That
in all cases of appeals, or writs of error, prosecuted
or brought before the Court of Appeals by the plaintiff,
upon a bill or bills of exception, when the judgment
excepted to shall be affirmed, and it shall appear to the
said Court that the substantial merits of the case are not
determined by the said judgment, the said Court of
Appeals shall and may, in their discretion, direct their
clerk to return the transcript of the record to the clerk
of the County Court which gave the judgment, with a
writ of *procedendo* to the Judges of said County Court,
commanding them to proceed in such action, and to a
new trial thereof, in the same manner, as if no trial had
taken place, or any appeal had been prosecuted, or writ
of error brought ; and the opinion of the Court of Appeals
shall be conclusive in law as to the question by them
decided ; and the said County Court shall thereupon
proceed in such action by amendment of pleadings, or
otherwise, in manner and form as is now practiced in
cases where writs of *procedendo* issue under the existing
laws ; provided, that nothing herein contained shall be
construed to authorize the return of any transcript in
any cause where the judgment of the Court of Appeals
would be a bar to a new action brought upon the same
cause." Where the plaintiff could bring a new action
notwithstanding the judgment of the Court of Appeals,

the Court was authorized to save him this expense and delay by ordering a new trial, when the substantial merits of the case had not been determined. In *Beall's Lessee vs. Beall*, being an ejectment case, the plaintiff could have brought a new action. And it is evident that a new action could have been brought in *Parker vs. Sedwick*. In fact this Court would have had no right to order a new trial in either case, unless the plaintiff had the right to bring a new action. This is evident from the terms of the Act of Assembly, and was so stated in commenting on *Parker vs. Sedwick*, by this Court in *Farmers' Bank of Md. vs. Bowie*, 4 *Md.*, 296, where a new trial was refused after an affirmance on plaintiff's appeal; although in the Court's opinion the substantial merits of the case had not been determined by the judgment.

There is another case which we will notice, although it was not mentioned in the argument. In *State vs. Baltimore and Ohio Railroad Co.*, 48 *Md.*, 49, the action was brought to recover the tax levied under the Act of 1872, chapter 234. It was contended in behalf of the railroad company that the exemption from taxation under the eighteenth section of its charter extended to and covered all its property. The case was tried before the Court below, without the intervention of a jury. The Court rendered a verdict and judgment for the defendant; thus exempting all its property from taxation. On appeal, this Court decided that the gross receipts derived from all properties and investments held and owned by the railroad under franchises granted subsequently to its Act of incorporation, and upon which no exemption from taxation was engrafted, were liable to the tax levied by the Act of 1872. The prayers on the part of the State did not present propositions of law in accordance with the views of this Court, and were therefore properly rejected by the Court below. But a very

palpable error in law was committed by the trial Court in holding that the railroad's property was entirely exempt from taxation ; and this Court said that if it had been obliged to affirm the judgment below, it would have remanded the case for a new trial. There were, however, other errors which made it necessary to reverse the judgment, and so the Court did not have occasion to exercise the power in question. Other cases have been cited in which new trials have been refused by this Court. Their facts were different from those appearing in this case, and their application to the present question consists chiefly in showing how firmly this Court has adhered to the rule of confining its attention to the record. We quote from *McCann, et al., Adm'rs, &c. vs. Sloan & Calwell*, 26 *Md.*, 82 : "The fifth Article of the Code, sec. 16, enacts, that 'in all cases where judgments shall be reversed or affirmed by the Court of Appeals, and it shall appear to the Court that a new trial ought to be had, a writ of *procedendo* shall issue.' It is obvious from the language of this section, as well as the final character of decisions in this Court, that the propriety of a new trial must appear from the record before the Court, at the time of the reversal or affirmance of the case under consideration. Any other construction would convert this Court into a tribunal of original, instead of appellate jurisdiction."

The refusal of the motion for a new trial after affirmance was founded on this rule in *Watchman & Bratt vs. Crook, et al.*, 5 *Gill & J.*, 268 ; *Kilgour vs. Miles & Goldsmith*, 6 *Gill & J.*, 274; and *Lester vs. Hardesty*, 29 *Md.*, 55.

In the case at bar the declaration aptly, properly and in due technical form set forth causes of action, and averred that they were recoverable from the defendants under Archer's first official bond. The questions of law and fact arising on these averments have been decided according to the established course of proceeding, and

Archer, *et al. vs.* State.

judgment has been duly and regularly rendered.   Nothing more can be suggested which is necessary to the validity of this judgment as a final settlement of the questions in the cause.   No principle or rule of practice will authorize another trial of these issues.   If we should decide otherwise we should destroy confidence in the conclusiveness of judgments, and greatly multiply the evils of litigation, by introducing into the administration of justice uncertainties and embarrassments which never existed before.   We have nothing to do with the supposed hardship of the case ;  but it must be evident that the hardship is not entirely on one side.   When Archer's sureties executed this official bond, they had a most just and reasonable expectation that their liability would not extend beyond the period of two years, with the addition of the short time allowed by law for the qualification of a successor.   Circumstances, which are well known, continued their liability for two years longer ; and this occurred without any default on their part. The law operated against them with great severity, but it was enforced.   On the present occasion it operates to protect them, and it will likewise be enforced now.

*Motion overruled.*

(Decided 23rd October, 1891.)